UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

ROBERT REYNOLDS,

        Plaintiff,

v.

PETER WATSON et al.,

        Defendants.
_____/

Case No. 2:23-cv-46

Honorable Jane M. Beckering

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim.

## Discussion

### I. Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Newberry Correctional Facility (NCF) in Newberry, Luce County, Michigan. The events about which he complains occurred at that facility, the Lakeland Correctional Facility (LCF) in

Coldwater, Branch County, Michigan, and the Parnall Correctional Facility (SMT) in Jackson, Jackson County, Michigan. Plaintiff sues NCF Nurses Vicki Sherbrook and Joseph Richter, LCF medical provider R. Yarn, and SMT Nurse Practitioner Peter Watson.

The crux of Plaintiff's complaint is that he has been suffering from pain related to his coccyx since 2019 and that each of the Defendants has played some role in failing to provide treatment for his pain. Plaintiff has disregarded the Court's requirement that he file his complaint on the Court's approved form for claims under 42 U.S.C. § 1983. Thus, he did not have the benefit of the Court's instruction to provide facts rather than legal arguments. Plaintiff's complaint includes few facts and many conclusory statements that parrot the elements of the claims he raises. Fortunately, Plaintiff has attached several documents from his medical records, a grievance and responses, and an article regarding his condition to supplement his allegations.[1]

Plaintiff separates his complaint into sections by correctional facility.

---

[1] The Court may consider documents that are attached to a *pro se* complaint when evaluating whether the complaint states a claim upon which relief should be granted. *See, e.g.*, *Powell v. Messary*, 11 F. App'x 389, 390 (6th Cir. 2001) (affirming the Eastern District of Michigan District Court's consideration of the attachments to plaintiff's complaint to determine that the plaintiff had received medical treatment and, therefore, failed to state a claim under the Eighth Amendment); *Hardy v. Sizer*, No. 16-1979, 2018 WL 3244002 (6th Cir. May 23, 2018) (affirming this Court's consideration of the plaintiff's complaint allegations and the documents attached to the complaint to support the determination that the plaintiff failed to state a claim); *Hogan v. Lucas*, No. 20-4260, 2022 WL 2118213, at *3 n.2 (6th Cir. May 20, 2022) (stating that "[b]ecause the documents attached to Hogan's complaint are referenced in the complaint and 'central to the claims contained therein,' they were properly considered at the § 1915(e)(2) screening stage" (citations omitted)). In considering the documents, the Court accepts as true Plaintiff's statements set forth in the grievances and the medical record documents. Moreover, the Court will accept as true the statements regarding Plaintiff's condition as set forth in the article. Although the Court would not typically accept as true the statements of the healthcare providers or the grievance responders, in this instance, those statements are not inconsistent with the facts reported by Plaintiff. Nonetheless, in the same way Court does not accept as true Plaintiff's conclusory statements that the care provided was inadequate, the Court also does not accept as true the conclusory statements of the grievance responders that the care provided was adequate.

2

### A. Defendant Watson at SMT

Plaintiff's allegations relating to Defendant Watson and SMT are set forth in ¶¶ 10–18 of the complaint. (ECF No. 1, PageID.2–3.) Documents relating to Defendant Watson's involvement in Plaintiff's care include the following: a March 15, 2019, note from Defendant Watson to Plaintiff (ECF No. 1-2, PageID.14); a May 3, 2019, note from Defendant Watson to Plaintiff (ECF No. 1-2, PageID.15); a November 30, 2019, Health Care Request from Plaintiff to "Medical" (ECF No. 1-2, PageID.16); a November 30, 2019, response to Plaintiff's Health Care Request from Nurse Crystal Trout (ECF No. 1-3, PageID.17); a November 17, 2020, Health Care Request from Plaintiff to "Medical" (ECF No. 1-4, PageID.18); and a November 18, 2020, response to the Health Care Request by Nurse Cynthia Brzyski (ECF No. 1-5, PageID.19).

The March 15, 2019, note from Defendant Watson to Plaintiff states:

> I am kiting to inform you that my request for an orthopedic consultation was not approved. I have submitted a req[ue]st for an MRI of your coccygeal/lumbar region which also was not approved. I lastly submitted a req[ue]st for physical therapy which was not approved. I have contact[ed] my Regional Medical Director to review this case. When I hear something I will kite you and let you know.

(ECF No. 1-2, PageID.14.) The May 3, 2019, note from Defendant Watson to Plaintiff states:

> Your x-rays dated 2-22-19 of you[r] coccyx, sacrum and bilateral sacroiliac joints were reported as "normal".
>
> I have asked my Regional Medical Director for further assistance in attending to this case.
>
> At this time please continue stretching as tolerated, take your Mobic as ordered. When I receive information I will contact you with further plan of care.

(*Id.*, PageID.15.) Plaintiff's subsequent November 30, 2019, communication to the medical department noted that he was in constant pain and that the pains were sharp. (ECF No. 1-2, PageID.16.) He directed it to Defendant Watson, but the response came from Nurse Crystal Trout.

3

She indicated that an appointment with a medical provider had been requested and advised Plaintiff to watch for a call out. (ECF No. 1-3, PageID.17.)

Plaintiff makes no factual allegations—and the attached documents provide no information—regarding Plaintiff's condition or the treatment for that condition for many months after Nurse Trout's response. Based on the information Plaintiff provides, nearly a year passed. Then, on November 17, 2020, Plaintiff reported that he could barely sit, stand, or even walk. (ECF No. 1-4, PageID.18.) Neither the documents nor the allegations show whether that information was ever conveyed to Defendant Watson.

Plaintiff does not offer facts to bridge the gaps between the events chronicled in the documents. He simply makes broad conclusory statements. For example, Plaintiff states that Defendant Watson was obligated to provide Plaintiff with adequate medical care. (Compl., ECF No. 1, PageID.2–3, ¶ 12.) Plaintiff also states that Defendant failed to adequately provide medical treatment in violation of MDOC policies. (*Id*., PageID.3, ¶ 13.) Further, Plaintiff states that "Defendant [Watson] was 'Deliberate indifference' to this Plaintiff's serious medical needs via, having [Plaintiff], in a state of the 'unnecessary and wanton infliction of pain', prohibited by the Eighth Amendment." (*Id*. ¶ 14.) Additionally, Plaintiff contends that Defendant Watson "knew of and disregarded a substantial risk of serious harm to . . . Plaintiff's health, in [that] he kept [Plaintiff] assigned to a top bunk, knowing [Plaintiff] was in a severe state of pain and suffering." (*Id*. ¶ 15.) Plaintiff does not state that he ever requested a bottom bunk nor does he indicate that he ever spoke with Defendant Watson about a bottom bunk detail.

### B.   Defendant Yarn at LCF

Plaintiff does not identify when he was transferred from SMT to LCF. He does not supply any documents regarding his time at LCF. His allegations regarding the care he received there are set forth in ¶¶ 19–23 of the complaint. (*Id.*, PageID.3–4.) Plaintiff alleges that he gave Defendant

Yarn notice that the "Tylenols" were not working to address the pain. (*Id.*, PageID.3, ¶ 19.) Plaintiff's Affidavit also notes that "Yarn, said, that he had requested a[n] MRI but it was denied." (Aff., ECF No. 1-1, PageID.11, ¶ 7.) Those are the only factual allegations relating to Defendant Yarn.

    Plaintiff also offers the following legal conclusions regarding Defendant Yarn:

- "Yarn . . . subjected this Plaintiff/Prisoner to more 'Deliberate indifference' . . . ."

- "Yarn . . . knew that, I was being held in a state of pain and suffering, thus was 'Deliberate indifference' via, failing to exercise due care, per subjecting this prisoner to an infliction of unnecessary suffering by failing to treat a medical need, as being inconsistent with contemporary standard of decency."

- "Yarn, left me, indefinitely to suffer, cruel and Unusual Punishments Inflicted, to violate, both Federal and State Constitutions . . . ."

(Compl., ECF No. 1, PageID.3–4, ¶¶ 19–21.) Plaintiff does not make any mention of a bunk detail during the time period he was at LCF.

    **C.**    **Defendants Sherbrook and Richter at NCF**

    Plaintiff next sues Defendants Sherbrook and Richter, nurses at NCF. There are four distinct sources of information with regard to Plaintiff's treatment at NCF: (1) his allegations in the complaint (Compl., ECF No. 1, PageID.4–5, ¶¶ 24–34); (2) his allegations in his affidavit (Aff., ECF No. 1-1, PageID.12, ¶¶ 9–15); (3) the documents from his NCF medical record (ECF Nos. 1-6, 1-7, 1-8, 1-9, 1-11, 1-12, 1-13, 1-14, and 1-15); and (4) his grievance and appeals and the MDOC responses (ECF No. 1-10, PageID.32–37).

    Drawing from the grievance responses, it appears that Plaintiff transferred in to NCF on June 9, 2022. Within a matter of weeks, Plaintiff was transported off-site for x-rays. The findings were normal. An unidentified medical provider advised Plaintiff to submit a healthcare request if his tailbone pain worsened or even if it did not improve.

5

Plaintiff submitted a request on September 30, 2022, for tailbone pain. (ECF No. 1-6, PageID.20.) Defendant Sherbrook responded the next day with the following: "You will be scheduled with nursing for an evaluation, watch the call outs." (ECF No. 1-7, PageID.21.)

Plaintiff was evaluated by nursing on October 4, 2022, and, based on that evaluation, referred to the non-party medical provider. (*See* ECF No. 1-10, PageID.33.) The medical provider saw Plaintiff on October 7, 2022. The provider requested an MRI. (*See id*.) That request was initially denied. The provider appealed the denial on October 12, 2022. (*See id*.)

While waiting for that decision, Plaintiff filed a new health care request, acknowledging that he was waiting on the MRI, but noting that he was still suffering from severe pain. (ECF No. 1-8, PageID.22.) Plaintiff indicated that his request was "Non-urgent." (*Id*.) Two days later, Defendant Richter advised Plaintiff that the medical provider was still working on the MRI approval and that Plaintiff should kite again if he wanted to be seen in the clinic for pain. (*Id*.; ECF No. 1-9, PageID.23.)

Plaintiff filed his grievance against all of the Defendants two days after Defendant Richter responded. On November 23, 2022, the first step grievance response recounted the history of Plaintiff's treatment at NCF. That account is not inconsistent with Plaintiff's account. The grievance response closed with the following:

> Healthcare does not deny the pain and discomfort you are experiencing. The MP has submitted for an MRI and it was initially denied in favor of utilizing conservative management, including home exercises, physical therapy, and activity modifications. The MP disagrees with this denial and is appealing the decision. The MP has noted in his documentation that you have failed treatments with tylenol, celebrex, cymbalta, mobic, flexeril, naprosyn, and ibuprofen. The onsite MP is in favor of the MRI and is seeking approval.

(ECF No. 1-10, PageID.33.)

Plaintiff appealed the denial. (*Id*., PageID.35.) As he waited for a response, on December 18, 2022, he submitted another health care request, again complaining of debilitating back pain.

6

(ECF No. 1-11, PageID.38.) Another NCF nurse responded that Plaintiff would be scheduled for a nursing evaluation. (ECF No. 1-12, PageID.39.)

There is no indication of when that evaluation occurred; but there was an apparently new medical detail special accommodation that included a bottom bunk detail, which is dated December 28, 2022. (ECF No. 1-15, PageID.43.) Plaintiff was approved for the MRI; the MRI was completed on January 4, 2023 (ECF No. 1-10, PageID.34; ECF No. 1-14, PageID.41); and then Plaintiff saw the medical provider on January 17, 2023.[2] (ECF No. 1-10, PageID.34; ECF No. 1-13, PageID.40.) The medical provider continued the bottom bunk detail indefinitely. (ECF No. 1-15, PageID.42.) The medical provider also submitted a request for approval to send Plaintiff to a pain clinic for epidural steroid injections in the affected area. (ECF No. 1-10, PageID.34.) At the time the second step grievance response was signed on January 19, 2023, the medical provider was still waiting on approval. (*Id*.) Plaintiff does not indicate whether he has ever received the injections. Plaintiff also does not identify what treatment he seeks for his condition.

Plaintiff has supplied an article regarding his condition that describes pain at the coccyx as "coccydynia." (ECF No. 1-18, PageID.46.) The article describes several possible causes, including trauma from a fall or prolonged sitting with poor posture on a hard surface. (*Id*., PageID.47.) Diagnosis does not typically require imaging—the diagnosis can be confirmed by palpation that reproduces the symptoms. (*Id*., PageID.48.) Nonetheless, imaging, first x-rays and then, perhaps, MRI, may be required for patients with persistent symptoms. (*Id*., PageID.48–51.)

The article notes that 90 percent of cases of acute coccydynia will resolve without medical care or with conservative management, such as "protection, analgesics, and heat or ice rather than more invasive therapy." (*Id*., PageID.49.) The article indicates that persistent cases may require

---

[2] Neither plaintiff's complaint nor associated documentation indicate the results of the MRI.

additional treatments, such as injections, medications for chronic pain, physical therapy, or manipulation. (*Id.*, PageID.51–52.) Finally, as a last resort, surgical excision of the coccyx may provide relief. (*Id.*, PageID.52.)

In Plaintiff's complaint, he specifically references certain MDOC policy directives: MDOC Policy Directive 03.04.100 (eff. Jan. 9, 2023), regarding MDOC Health Services; and MDOC Policy Directive 03.03.130 (eff. Apr. 1, 2022), regarding Humane Treatment. Additionally, Plaintiff references the MDOC's practices regarding Medical Detail Special Accommodations. The MDOC Policy Directive relating to those accommodations is 04.06.160 (eff. Aug. 24, 2020). Of some significance to the analysis of Plaintiff's claims are definitions that appear in the policy directives:

> DEFINITIONS
>
> A. <u>Medical Provider</u>: A qualified health professional who is a physician, physician assistant, or nurse practitioner licensed to practice in the State of Michigan.
>
> B. <u>Qualified Health Professional (QHP)</u>: A Physician, Psychiatrist, Nurse Practitioner, Physician Assistant, Psychologist, Social Worker, Licensed Professional Counselor, Dentist or Registered Nurse who is licensed and registered/certified by the State of Michigan to practice within the scope of their training.

MDOC Policy Directive 04.06.140 (eff. Aug. 24, 2020).[3] Although Plaintiff describes all four Defendants as "Medical Providers," Defendants Sherbrook and Richter do not fall within that category under the policy directive. Defendant Watson does. Because Plaintiff does not identify Defendant Yarn's professional designation, it is not clear whether he would be considered a medical provider under the policy directive.

---

[3] The same definitions appear in MDOC Policy Directive 03.04.100, ¶¶ C, E (eff. Jan. 9, 2023).

Plaintiff seeks hundreds of thousands of dollars in compensatory and punitive damages. He also seeks a declaration that Defendants violated his rights and an injunction compelling Defendants to stop inadequate medical treatment and cruelty.

## II.     Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

### A.     Federal Constitutional Violation

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by

a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). Plaintiff contends that Defendants' actions (or inaction) violated his right to be free from cruel and unusual punishment under the Eighth Amendment.[4]

The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104–05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious

---

[4] Plaintiff also makes passing reference to the Fourteenth Amendment and "being deprived of guaranteed, protected liberty/liberties . . . ." (Compl., ECF No. 1, PageID.6.) The Due Process Clause of the Fourteenth Amendment "provide[s] a guarantee of fair procedure in connection with any deprivation of life, liberty, or property by a State." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). Plaintiff's claim is not that he was deprived of adequate health care without process, it is that he was deprived of adequate health care. In that sense, "the Fourteenth Amendment affords no greater protection than the Eighth Amendment for inmate claims alleging unlawful infliction of pain or punishment . . . ." *Doe v. Sullivan Cnty., Tenn.*, 956 F.2d 545, 556 (6th Cir. 1992) (citing *Whitley v. Albers*, 475 U.S. 312, 327 (1986)). The more general notion of substantive due process likewise provides no greater or different relief. "[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997). Thus, Plaintiff's allegations relating to a due process violation do not state any claim separate from his Eighth Amendment claim.

10

harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004); *see also Phillips v. Roane Cnty.*, 534 F.3d 531, 539–40 (6th Cir. 2008). Obviousness, however, is not strictly limited to what is detectable to the eye. Even if the layman cannot see the medical need, a condition may be obviously medically serious where a layman, if informed of the true medical situation, would deem the need for medical attention clear. *See, e.g.*, *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (holding that prisoner's severed tendon was a "quite obvious" medical need, since "any lay person would realize to be serious," even though the condition was not visually obvious). The Court concludes that Plaintiff's allegations suffice to show that he suffered a serious medical need.

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind" in denying medical care. *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000). Deliberate indifference "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. To prove a defendant's subjective knowledge, "[a] plaintiff may rely on circumstantial evidence . . . : A jury is entitled to 'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (quoting *Farmer*, 511 U.S. at 842).

However, not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

11

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105–06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017); *Briggs v. Westcomb*, 801 F. App'x 956, 959 (6th Cir. 2020); *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *Perez v. Oakland Cnty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440–41 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).

Plaintiff's complaint falls short with regard to the subjective component. Plaintiff has adequately alleged that he had a serious medical need. He has also adequately alleged that each

Defendant was aware of that need and the risk of harm that Plaintiff faced. His allegations, however, do not suggest that any of the Defendants disregarded his need or the risk he faced.

With respect to Defendant Watson, although Plaintiff alleges in a conclusory manner that Defendant Watson acted with "deliberate indifference," Plaintiff has failed to allege facts to support his assertion. Instead, the facts alleged by Plaintiff show that Defendant Watson credited Plaintiff's complaints of pain and that Defendant Watson had a medical treatment plan for Plaintiff, wherein he sought the necessary approval to provide Plaintiff with additional treatment and diagnostic testing. Specifically, Defendant Watson first had Plaintiff receive an x-ray. The x-ray, which was dated February 22, 2019, showed that the "coccyx, sacrum and bilateral sacroiliac joints were . . . normal.'" (ECF No. 1-2, PageID.15.) Despite this "normal" x-ray, Defendant Watson sought approval for Plaintiff to receive an orthopedic consultation, presumably with an outside provider, and an MRI. (*See id.*, PageID.14.) Defendant Watson's requests were not approved, but Defendant Watson advised Plaintiff that he had contacted the "Regional Medical Director to review this case," apparently in another attempt to gain approval for the orthopedic consultation and the MRI. (*Id.*) In a subsequent communication with Plaintiff, Defendant Watson again advised Plaintiff that he had asked the "Regional Medical Director for further assistance in attending to this case," and he advised Plaintiff to "please continue stretching as tolerated, take your Mobic as ordered." (*Id.*, PageID.15.) Defendant Watson further advised Plaintiff: "When I receive information I will contact you with further plan of care." (*Id.*) Several months later, Plaintiff submitted a written communication to the medical department regarding the pain he was experiencing, which he directed to Defendant Watson (ECF No. 1-2, PageID.16.); however, Nurse Crystal Trout responded to the communication, indicating that an appointment with the medical provider had been requested. (ECF No. 1-3, PageID.17.) There are no facts alleged to suggest that

13

Defendant Watson was aware of this written communication. There are also no facts alleged to suggest that Plaintiff had any further interaction with Defendant Watson.

Under these circumstances, contrary to Plaintiff's assertion that Defendant Watson acted with deliberate indifference, it is apparent that Defendant Watson did not disregard a substantial risk of serious harm to Plaintiff; instead, Defendant Watson addressed Plaintiff's serious medical need by following a diagnostic path and treatment approach, and when Defendant Watson's requests for approval for additional diagnostic steps were denied, Defendant Watson sought reconsideration of these denials from the Regional Medical Director. It is clear that Plaintiff may have disagreed with Defendant Watson's treatment plan and that Plaintiff wished that his pain would have been easily revolved; however, "a patient's disagreement with his physicians [or other medical providers] over the proper course of treatment alleges, at most, a medical-malpractice claim, which is not cognizable under § 1983." *Darrah*, 865 F.3d at 372 (citations omitted); *Mitchell*, 553 F. App'x at 605 ("[A] desire for additional or different treatment does not suffice by itself to support an Eighth Amendment claim." (citations omitted)). Moreover, in this action, Defendant Watson is not the individual who prevented Plaintiff from receiving the additional tests; instead, Defendant Watson sought additional diagnostic tests and treatment for Plaintiff, but his requests were denied by an unnamed non-party.[5] *See Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008) (discussing that a claimed constitutional violation must be based upon active unconstitutional behavior by a defendant); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002).

---

[5] It appears that Defendant Watson followed the diagnostic path and the treatment approach identified in the article provided by Plaintiff. As discussed above, he was hindered in that effort, but the fact that he was prevented from pursuing more invasive therapies or additional diagnostic testing does not support an inference that he was deliberately indifferent to Plaintiff's need.

14

In addition to Plaintiff's claims regarding the medical treatment that Defendant Watson provided, Plaintiff alleges in a conclusory manner that Defendant Watson "knew of and disregarded a substantial risk of serious harm to . . . Plaintiff's health, in which he kept [Plaintiff] assigned to a top bunk, knowing [Plaintiff] was in a severe state of pain and suffering." (ECF No. 1, PageID.3.) However, Plaintiff has failed to allege sufficient facts to support this conclusory assertion. Plaintiff simply states that Defendant Watson kept Plaintiff assigned to a top bunk; Plaintiff does not allege that he requested a bottom bunk detail from Defendant Watson. Indeed, it is not clear from the *facts* alleged that Plaintiff and Defendant Watson even discussed bunk assignments. Under these circumstances, based on the facts alleged by Plaintiff, it is not clear when, if ever, Plaintiff requested the bottom bunk detail, and it is not clear what information Plaintiff provided to support his request for a bottom bunk detail. Under these circumstances, Plaintiff appears to ask the Court to fabricate plausibility to his claims from mere ambiguity. However, Plaintiff's scant facts about his bunk assignment are insufficient to state a claim against Defendant Watson.

Likewise, the scant facts that Plaintiff has provided with regard to Defendant Yarn suggest that he was in the same position as Defendant Watson. For example, Plaintiff states that he told Defendant Yarn that the "Tylenols" were not working to address the pain (ECF No. 1, PageID.3), and at some point, "Yarn, said, that he had requested a[n] MRI but it was denied." (Aff., ECF No. 1-1, PageID.11, ¶ 7.) Further, Plaintiff alleges in a conclusory manner that Defendant Yarn acted with deliberate indifference. However, as was the case with Defendant Watson, Plaintiff fails to allege *facts* to support this assertion. Instead, the facts alleged by Plaintiff show that Defendant Yarn sought to provide Plaintiff with additional diagnostic testing—an MRI—however, some unnamed person denied this request. The fact that someone else denied Defendant Yarn's request

15

for additional diagnostic treatment does not show that Defendant Yarn himself disregarded Plaintiff's medical needs. *See Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.")

Plaintiff provides significantly more detail with regard to the diagnostic and treatment efforts at NCF, where Plaintiff states that Defendants Sherbrook and Richter worked. However, the only information Plaintiff provides with regard to Defendants Sherbrook and Richter indicates that they promptly responded to Plaintiff's requests for assistance by scheduling evaluations. Moreover, the non-party NCF medical provider—the individual responsible for setting the course of treatment—ultimately succeeded in obtaining approval for an MRI.

Plaintiff focuses on the fact that he was not given a bottom bunk detail until December of 2022. But Plaintiff does not indicate that he ever asked any of the Defendants for such a detail before that time. He does not allege that he asked any of the Defendants, and such a request does not appear in the documents attached to his complaint. Furthermore, the need for such a detail is not obvious based upon the information he has provided regarding his condition. That information indicates that coccydynia pain is exacerbated by sitting; it does not suggest that climbing into a top bunk would be problematic.

Plaintiff notes his desire for a bottom bunk for the first time when he arrived at NCF on June 9, 2022. He states that he explained the necessity for a bottom bunk "upon (NCF)'s intake . . . ." (Aff., ECF No. 1-1, PageID.12.) But he does not state to whom he offered the explanation. He does not mention Defendant Sherbrook's involvement until more than three months later; he does not indicate that Defendant Richter was involved until another month after that. The first time Plaintiff's desire for a bottom bunk appears in the documents he has provided

is in his Step II grievance appeal drafted on November 29, 2022. (ECF No. 1-10, PageID.35.) He was given the detail a few weeks later.

Plaintiff's conclusory statements that Defendants were deliberately indifferent, that they unnecessarily and wantonly inflicted pain, or that they knew of and disregarded a substantial risk of serious harm to Plaintiff's health, are not supported by the facts he alleges and the documents that he attaches to his complaint.

In summary, Plaintiff has not alleged facts that support an inference that any of the named Defendants were aware of, ***and disregarded***, a substantial risk of serious harm to Plaintiff. Accordingly, he has failed to state a claim against them.

### B. State Law Claims

Plaintiff's allegations suggest that Defendants violated his rights under state law. He specifically notes that Defendants violated the Michigan Constitution and MDOC policy directives. Moreover, his claims regarding "inadequate care" suggest possible tort liability for negligence or professional malpractice.

Claims under § 1983 can only be brought for "deprivations of rights secured by the Constitution and laws of the United States." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982). Section 1983 does not provide redress for a violation of a state law. *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995); *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994). Any assertion that Defendants violated state law or the MDOC policy directives fails to state a claim under § 1983.

To the extent Plaintiff intended to raise separate state law claims against these Defendants, this Court could consider those claims by exercising supplemental jurisdiction over them. In determining whether to retain supplemental jurisdiction over state law claims, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation

17

and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)). Here, the balance of the relevant considerations weighs against the continued exercise of supplemental jurisdiction. Therefore, Plaintiff's state law claims will be dismissed without prejudice.

## **Conclusion**

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's claims under 42 U.S.C. § 1983 will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court will dismiss Plaintiff's state law claims without prejudice because the Court declines to exercise supplemental jurisdiction over them.

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). Although the Court concludes that Plaintiff's claims are properly dismissed, the Court does not conclude that any issue Plaintiff might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Accordingly, the Court does not certify that an appeal would not be taken in good faith. Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610–11, unless Plaintiff is

barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

    This is a dismissal as described by 28 U.S.C. § 1915(g).

    A judgment consistent with this opinion will be entered.


Dated:     June 1, 2023                                    /s/ Jane M. Beckering
                                                                                             Jane M. Beckering
                                                                                             United States District Judge